WILSON v. SEYBOLD et al

(District Court, N. D. West Virginia. October 1, 1914.)

1. SPECIFIC PERFORMANCE (§ 57*)—OPTION—EXECUTORY CONTRACT.

Defendant's ancestor executed to complainant's grantor a written option to convey the timber on certain land, provided such grantor elected to purchase or make sale of the timber within four months. The option was under seal and acknowledged the receipt of one dollar paid as a consideration. The option was assigned to complainant, and within the time specified he gave notice to defendant's ancestor of his acceptance, etc. *Held*, that the option thereby became an executory contract of sale, and was therefore a proper subject of suit for specific performance.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 178; Dec. Dig. § 57.*]

2. ASSIGNMENTS (§ 18*)—OPTION TO SELL TIMBER—RIGHT TO ASSIGN.

Where the owner of certain timber executed an option to convey the timber at a specified price to complainant's grantor or his assigns, the option granting four months within which such grantor could elect to purchase "or make sale" of the timber, it was a proper subject of assignment, and could be accepted by the assignee.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. §§ 25–27; Dec. Dig. § 18.*]

3. LOGS AND LOGGING (§ 3*)—SALE OF TIMBER—FURNISHING TITLE—PAYMENT OF PRICE—CONCURRENT CONDITIONS.

Where a contract for the sale of timber obligated the vendor to furnish a good title and the vendee to pay a specified price, the conditions were concurrent; the primary obligation being on the vendee to tender the money and demand a deed, at which time the vendor was required to tender a good title.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 6–12; Dec. Dig. § 3.*]

4. SPECIFIC PERFORMANCE (§ 95*)—CONDITIONS PRECEDENT—TENDER OF TITLE —PAYMENT OF PRICE.

A purchaser, entitled to a good title, need not pay the purchase money until he gets a good title, and may in good faith dispute the title tendered and refuse to pay the purchase price, provided the objection is sufficiently plausible to cause a prudent man to hesitate; and specific performance will not be defeated thereby, though the objection subsequently turn out to be unsustainable.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 257–277; Dec. Dig. § 95.*]

5. SPECIFIC PERFORMANCE (§ 105*)—RIGHT TO RELIEF—LACHES.

Defendant's ancestor in January, 1906, contracted to convey the timber on 770 acres of land to complainant's grantor, and to deliver a good and sufficient title. Complainant expressed his readiness to pay the price, but demanded conveyance of a good title; and, the title then being seriously clouded, the seller instituted proceedings in which he ultimately established his title to only 540.5 acres. On the day this decision was rendered the vendor died, and five months after April 5, 1912, when the mandate on appeal in such proceeding was handed down and recorded, com-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

plainant instituted suit for specific performance as to the 540.5 acres. *Held*, that the vendor's obligation to furnish a good title descended to his devisees, it being for complainant to determine whether he would take a smaller quantity, with abatement of the price, or insist on a cancellation of the contract, and that his right to enforce specific performance as to the smaller quantity was not barred by laches.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 325–341; Dec. Dig. § 105.*]

6. SPECIFIC PERFORMANCE (§ 91*)—RIGHT TO SUE—REQUISITES.

Where defendant's testator had contracted to convey the timber on certain land to complainant's assignor, and complainant had made demand on testator for performance, but he had failed to perform by furnishing a good title, and had sought to annul the contract, complainant was entitled to sue for specific performance without making a further demand on the devisees.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 230–232; Dec. Dig. § 91.*]

7. SPECIFIC PERFORMANCE (§ 91*)—REQUISITES—DEMAND.

It was not a condition precedent to complainant's right to sue for specific performance that he had failed to make a demand for performance, where defendants in their answer admitted that the demand, if made, would have been refused.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 230–232; Dec. Dig. § 91.*]

8. SPECIFIC PERFORMANCE (§ 97*)—REQUISITES—TENDER OF PRICE.

The holder of a contract to convey timber was not bound to tender the price simultaneously with the filing of a bill for specific performance, he being authorized to pay the price into court at any time before the cause was submitted for hearing.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 286–298; Dec. Dig. § 97.*]

9. SPECIFIC PERFORMANCE (§ 130*)—TITLE—CONVEYANCE—DELAY—INTEREST.

Defendants' testator contracted to convey the timber on 770 acres of land to complainant's assignor May 10, 1906, when an option was accepted; but testator was unable to convey a good title to any part of the land until April 5, 1912, when his title was finally quieted as to 540.5 acres. On the day of the decision testator died, and five months after complainant instituted suit against his devisees for specific performance, and on May 2, 1913, complainant paid into court the net purchase price at the contract rate. *Held*, that complainant was bound to pay interest from the date the title was finally quieted until he paid the purchase price into court.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 424, 425; Dec. Dig. § 130.*]

In Equity. Suit for specific performance by G. N. Wilson against F. H. Seybold and others. On final hearing. Decree for plaintiff.

Talbott & Hoover, of Elkins, W. Va., for plaintiff.

Ware & Viquesney, of Philippi, W. Va., and W. B. & E. L. Maxwell, of Elkins, W. Va., for defendants.

DAYTON, District Judge. These facts are undisputed: On January 12, 1906, Christian Seybold in his lifetime executed to "A. J. Crickard or his assigns" a written option whereby he agreed to convey "with good and sufficient title" the timber on 770 acres of land at the price of $20 per acre therefor. This contract grants four months

"within which said second party is to elect to purchase *or make sale* to the said timber"; if accepted within that period, Seybold was to immediately convey "good and sufficient title to the same upon the full consideration being paid in cash." The option is under seal and acknowledges the receipt of $1 paid as a consideration. This option was assigned by Crickard to plaintiff, Wilson, on May 9, 1906, and on May 10, 1906, Wilson gave Seybold notice of acceptance, both by telegram and letter, which notice was received by Seybold within the four months optional period. In 1904, two years prior to the execution of this option, Seybold had instituted an action of ejectment in the circuit court of Randolph county against Henry G. Davis, alleging the latter to be in possession of the land (upon which this timber in controversy was standing), and with unlawfully withholding the possession thereof from him. This suit he subsequently dismissed without prejudice, and in September, 1907, instituted another ejectment suit against said Davis, the Upper Elk Coal Company, and Gaines Green in the then Circuit Court of the United States for this district, containing in its declaration like charges of unlawful possession and the withholding of the same from him of this land. This last action was tried, and resulted in a judgment in favor of Seybold for 540.5 acres of the 770 acres of land claimed by him. A writ of error was sued out to this judgment to the Circuit Court of Appeals of this circuit, and, on the 4th day of March, 1912, that court handed down an opinion to affirm the judgment of the lower court. Davis v. Seybold, 195 Fed. 402, 115 C. C. A. 304. On that same 4th day of March, 1912, Seybold died testate, and his will was probated and admitted to record in Randolph county on April 18, 1912, and on September 4, 1912, this suit was instituted in the circuit court of Randolph county by Wilson against Seybold's executors and heirs at law, for specific performance, which suit was subsequently removed to this court.

[1] An ordinary option is not in itself a contract subject to equity's power to compel specific performance, but only a continuing offer to contract in futuro upon acceptance and compliance with certain specified terms and conditions. If this offer is not based upon a valuable consideration, it can be withdrawn at any time; but if based upon such consideration, no matter how small, it cannot, under ordinary conditions, be withdrawn until the fixed time for it to run has expired. Whether specific performance can be granted by equity depends upon whether the terms and conditions of the offer are accepted and complied with, whereby an executory contract of sale is created. It is such executory contract of sale, so created, that can be specifically enforced. When a continuing offer is accepted, and its terms complied with, the executory contract, thereby created, is subject to the same rules, as regards specific performance, as any other ordinary executory contract made direct, without intervention of an option. The crucial question, therefore, arising here, is whether such executory contract was in fact created and now exists. I think it very clear that it was created and does now exist for these reasons: The continuing offer or option was based upon a $1 consideration set forth under seal to have been paid. It could not, therefore, be withdrawn,

216 F.—62

and in fact was not attempted to be withdrawn, before the four months for it to run had expired. Prior to such expiration notice of its acceptance in full, as regards its terms and conditions, was given by Wilson and received by Seybold.

[2] The position taken that Crickard, the original optionee, could not assign the offer, and could therefore alone accept it, is clearly untenable, under the authorities hereinafter cited, because the option or offer to sell was in express terms made "to grant and convey unto the said A. J. Crickard or his assigns," and four months was "granted within which said second party [Crickard] is to elect to purchase *or make sale* to the said timber"; in other words, to purchase on his own account *or to sell the timber and transfer his right to buy to another.* He did within these four months, sell, transfer, and assign his right to buy to Wilson. This assignment to Wilson, Wilson's notice of acceptance to Seybold, and Seybold's acknowledgment of having received it, created the executory contract of sale provided, Wilson stood ready in good faith, at the time and afterwards, to pay in cash the $20 per acre, upon Seybold presenting to him "good and sufficient title" therefor.

[3] The obligations inter partes to furnish good title on one side and to pay the purchase money on the other are mutual and are to be performed simultaneously. Seybold could not be required to deliver title and then await the convenience of Wilson to pay; nor could Wilson be compelled to pay and await Seybold's convenience to furnish title. Seybold had to lay down his "good title" side by side with Wilson's money, so that Wilson could take delivery of the title deed at the moment that Seybold took possession of Wilson's money. The primary obligation, however, was upon Wilson to *tender* the money and demand the deed.

[4] To this general rule there is one exception, very pertinent here, and entirely in Wilson's favor. This exception is to the effect that a purchaser entitled to good title need not *pay* purchase money until he gets good title, and he may dispute the fact that the title tendered is good, and refuse to pay the purchase price, at the time, for that reason. But in so refusing he must act in entire good faith, and the existing grounds of objection to the title must be plausible enough to cause a prudent man to hesitate; and, if they be so, though turning out to constitute no defect, his right subsequently to specific performance will not be defeated.

[5] In this case, at the time the money was due to be paid by Wilson, he expressed his readiness to pay it, but demanded conveyance of good title. Seybold's title was at the time most seriously clouded. He had filed his declaration in ejectment against Davis, in which, technically, at least, he had admitted himself to be out of possession and Davis in possession of the land and the timber thereon. The proceedings to try out and match his right to the land as against Davis' right thereto pended in the courts (state and federal) for substantially six years before his was finally determined to be the better right. Such right, too, was only determined finally by the court of last resort upon writ of error, and then only established it to 540.5 acres of the 770

acres claimed by him, the timber upon the whole of which he had undertaken to sell. Under these circumstances Wilson had the soundest grounds for withholding payment of the purchase money until assured the "good title" could and would be forthcoming.

On the day the court decided finally that Seybold had good title to the 540.5-acre part of the 770 acres, Seybold died. The mandate was not handed down and recorded in this court until April 5, 1912. Wilson did not institute this suit until in September, five months thereafter. Can these executors and heirs of Seybold claim he was guilty of laches to their release from liability to perform the contract for that reason? No; because the obligation had descended to these devisees "to furnish good title" to the timber on the 540.5-acre part of the 770 acres their testator had undertaken to sell, and then it was for Wilson to determine whether he would take the smaller quantity, with abatement of the purchase price, or insist upon cancellation of the contract.

[6] Did Wilson have a right to institute this suit before making demand on these devisees for performance on their part? I think so, because demand had been made upon testator, and he had failed to perform by furnishing good title and had sought to withdraw his offer after its acceptance and to annul the contract.

[7] However, it seems to me this question becomes immaterial, because in their answer these devisees have voluntarily admitted that they would have refused to perform the contract if demand had been made upon them to do so.

[8] Finally, was it a condition precedent to maintaining this bill for Wilson to pay into court the purchase money tendered for the 540.5 acres of timber simultaneous with the filing of the bill? No. It is well settled that such payment into court could be made any time before the cause was submitted for hearing.

[9] One small, and in a sense trifling, question arising in the case, has given me more trouble than any other. It is this: Should Wilson be required to pay interest upon the purchase price? If so, from what time? Careful consideration of this question has led me to the conclusion that he should be required to pay such interest at 6 per centum per annum from the date of the Circuit Court of Appeals mandate, which finally determined the soundness of Seybold's title, up to the 2d day of May, 1913, when he paid into court $10,810, the net purchase price at $20 per acre for the 540.5 acres of timber. This sum was by consent loaned to a trust company at 4 per cent. interest. It, and such interest so earned at 4 per cent. and the interest due at 6 per cent. for the period above referred to from Wilson, should be, in my judgment, the gross amount payable to the defendants, and should be subject to deductions for plaintiff's costs of suit and the registrar's commission for loaning.

The legal principles enunciated herein are, in my judgment, fully sustained by the following authorities: Pollock v. Brookover, 60 W. Va. 75, 53 S. E. 795, 6 L. R. A. (N. S.) 403, and especially the note thereto; Fulton v. Messenger, 61 W. Va. 477, 56 S. E. 830; John v. Elkins, 63 W. Va. 158, 59 S. E. 961; Armstrong v. Md. Coal Co.,

67 W. Va. 589, 69 S. E. 195; Rease v. Kittle, 56 W. Va. 269, 49 S. E. 150; Turner v. McCormick, 56 W. Va. 161, 49 S. E. 28, 67 L. R. A. 853, 107 Am. St. Rep. 904; Tibbs v. Zirkle, 55 W. Va. 49, 46 S. E. 701, 104 Am. St. Rep. 977, 2 Ann. Cas. 421; Watson v. Coast, 35 W. Va. 463, 14 S. E. 249; Clark v. Gordon, 35 W. Va. 735, 14 S. E. 255; Barrett v. McAllister, 33 W. Va. 103, 12 S. E. 1106; Wheeling Creek G. C. & C. Co. v. Elder (C. C.) 170 Fed. 215; Standiford v. Thompson, 135 Fed. 991, 68 C. C. A. 425; McCullough v. Sutherland (C. C.) 153 Fed. 418, and especially bottom of page 425 and top of page 426, and authorities there cited; Bensel v. Gray, 80 N. Y. 517; Roberts v. Lovejoy, 60 Tex. 253; Warvelle on Vendors, vol. 2, p. 886.

Decree for specific performance in favor of plaintiff will be entered.